# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL          'O'   JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Samuel Brown | Joseph Reiter |

**Proceedings:**    CALTECH'S MOTION FOR SUMMARY JUDGMENT (Dkt. 67, filed March 8, 2021)

DEFENDANTS HARRY A. ATWATER, EDWARD M. STOLPER, AND JAQUELINE K. BARTON'S JOINDER AND MOTION FOR SUMMARY JUDGMENT (Dkt. 66, filed March 8, 2021)

## I.    INTRODUCTION

Relator Nathan S. Lewis (the "Relator") filed this *qui tam* action, under seal, against defendants California Institute of Technology ("Caltech"), Dr. Harry A. Atwater ("Dr. Atwater"), Dr. Edward M. Stolper ("Dr. Stolper"), and Dr. Jacqueline K. Barton ("Dr. Barton") on July 9, 2018. Dkt. 1 ("Compl."). Relator's initial complaint asserted claims for: (1) violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., against all defendants; and (2) retaliation in violation of the FCA, 31 U.S.C. § 3730(h), against Caltech. Id.

Following a period of investigation, the United States of America declined to intervene on June 19, 2019. Dkt. 13. Defendants thereafter moved to dismiss Relator's complaint on September 16, 2019. Dkt. 21. On October 28, 2019, the Court granted in part and denied in part defendant's motion to dismiss. Dkt. 31 ("MTD Order"). The Court granted the motion to dismiss relator's FCA claim, without prejudice, on the grounds that Relator failed to plead facts satisfying the FCA's falsity requirement under an implied false certification theory. Id. at 14. The Court denied the motion to dismiss with respect to Relator's FCA retaliation claim. Id. at 21.

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

On November 22, 2019, Relator filed the operative first amended complaint, alleging two claims for: (1) violation of the FCA, 31 U.S.C. § 3729 et seq., against all defendants, and (2) retaliation in violation of the FCA, 31 U.S.C. § 3730(h), against Caltech.  Dkt. 32 ("FAC").  Defendants filed an answer to the FAC on December 20, 2019.  Dkt. 35 ("Answ.").

On March 8, 2021, Caltech filed a motion for summary judgment, dkt. 67 ("Mot."), and submitted a statement of undisputed material facts in support thereof, dkt. 68 ("SUF"). The same day, defendants Dr. Atwater, Dr. Stolper, and Dr. Barton (the "individual defendants") joined in the entirety of Caltech's motion and separately moved for summary judgment in favor of the individual defendants.  Dkt. 66 ("Indv. Defs. MSJ").  On March 22, 2021, Relator filed an opposition, dkt. 70 ("Opp'n"), and submitted a response to defendants' statement of undisputed material facts and statement of additional disputed facts, dkt. 71 ("RSUF").  Caltech and the individual defendants each filed replies on April 5, 2021.  Dkts. 80 ("Reply"), 81 ("Indv. Defs. Reply").

The Court held a hearing on April 19, 2021.  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.    BACKGROUND

The following facts are not meaningfully disputed and are set forth for purposes of background.   Unless otherwise noted, the Court references only facts that are uncontroverted and as to which evidentiary objections have been overruled.

### A. Joint Center for Artificial Photosynthesis

In 2010, the United States Department of Energy ("DOE") awarded federal funding to Caltech and several partner institutions to create the Joint Center for Artificial Photosynthesis ("JCAP").  SUF ¶ 1. Caltech served as the lead institution for JCAP.  SUF ¶ 2. JCAP's initial project period, which ran from September 30, 2010 through September 29, 2015, is informally termed "JCAP 1."  SUF ¶ 3. JCAP's second project period, which was initially approved to run between September 30, 2015, through September 29, 2020, is informally termed "JCAP 2."  SUF ¶¶ 26, 35.

JCAP is governed by a Cooperative Agreement between the DOE and Caltech, which was executed in September 2010, in connection with the JCAP 1 project period.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'   JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|--------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

SUF ¶ 5. The DOE and Caltech modified the existing Cooperative Agreement to cover the JCAP 2 project period in July 2015.  SUF ¶ 36. The Cooperative Agreement included "change control provisions," governing circumstances in which modifications to JCAP required DOE approval. SUF ¶ 57.  Pursuant to the Cooperative Agreement, a "Level 1" change required Caltech to notify the DOE and receive approval, whereas a "Level 2" change required Caltech to provide notice, but did not require approval.  SUF ¶ 58.  The DOE expected that Caltech would comply with the change control provisions as a condition of its JCAP funding.  RSUF ¶ 189.  Likewise, Caltech's Associate Vice President for Research Administration testified that he understood that compliance with the terms and conditions of the Cooperative Agreement was a condition of funding.  RSUF ¶ 190.

The Cooperative Agreement also included a conflict of interest provision that incorporated the requirements of 10 C.F.R. § 600.142.  RUSF ¶ 200.  The conflict of interest provision required JCAP to submit a conflict mitigation plan and submit statements reflecting existing or proposed non-federal research projects and conflicts of interest disclosures for all senior JCAP personnel.  RUSF ¶¶ 201-2.  Further, JCAP was required to submit a proposed conflict mitigation plan for any individual with a conflict of interest. RSUF ¶ 203.

The DOE has oversight authority over projects governed by the JCAP Cooperative Agreements.  SUF ¶ 6.  The Cooperative Agreement includes a Statement of Substantial Involvement, which describes fifteen functions that the DOE performs in connection with JCAP, including: (1) "actively monitor[ing] JCAP's research and development activities," (2) "[a]nnually evaluat[ing] progress of JCAP research and development activities to determine whether research results satisfy [JCAP's] stated goals and objectives," and (3) "provid[ing] direction and/or re-direction of work."  SUF ¶ 7.

The DOE's contracting office was responsible for establishing the Cooperative Agreement with Caltech, SUF ¶ 8, and the DOE's Chemical Sciences, Geosciences, and Biosciences Division, within the Office of Basic Energy Sciences, (the "Program Office") is the DOE division responsible for managing JCAP's programs through the work of its program managers.  SUF ¶¶ 9,11.  Over the course of JCAP's existence, several individuals have served as Director of the DOE's Program Office, including Erich Rohlfing, Tanja Pietrass, and Bruce Garrett.  SUF ¶ 10.  During the period relevant to this litigation, the

**CIVIL MINUTES – GENERAL**          **'O'  JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

DOE program managers responsible for JCAP were Drs. Gail McClean and Christopher Fecko.  SUF ¶ 12.

### a.  JCAP 1

The JCAP 1 project plan submitted to the DOE on March 29, 2010, contemplates a broad scope of work directed towards developing "required components for a complete system that produced fuel from sunlight."  And SUF ¶ 4; dkt. 74-1, Lewis Decl. Exh. AA ("JCAP 1 Project Plan") at 5.  The JCAP 1 project plan included, *inter alia*, work on both water splitting and $CO_2$ reduction.  RUSF ¶ 219.  As such, the Project Plan explains that "JCAP will discover and develop homogenous, molecular, and heterogeneous catalysts for the key fuel-producing reactions of interest such as oxidation of water, reduction of water, and reduction of $CO_2$ to energy-rich liquid carbon-derived fuels."  JCAP 1 Project Plan at 5. Generally speaking, water splitting attempts to use chemical reactions to turn water into fuel.  RSUF ¶ 220.  In the context of renewable energy production, $CO_2$ reduction attempts to use atmospheric $CO_2$ to create carbon-based fuel.  RSUF ¶ 222.  Molecular catalysis of $CO_2$ and heterogenous catalysis of $CO_2$ are each separate lines of inquiry related to $CO_2$ reduction.  RSUF ¶ 224.

### i.  JCAP 1 Governance

JCAP 1 was governed by a Board of Directors, whose members included representatives from Caltech and its JCAP partner institutions.  SUF ¶ 13.  Dr. Stolper, who then served as Caltech's Provost, chaired the JCAP 1 Board of Directors.  SUF ¶ 14.

Dr. Barton, who was then Chair of Caltech's Division of Chemistry and Chemical Engineering, served as a member of the JCAP 1 Board of Directors until at least September 2012.[1]  SUF ¶ 15.  Dr. Barton has served on the Board of Directors of Dow Chemicals, a public company, since 1993.  SUF ¶ 135.  On June 21, 2012 Caltech received a letter from the DOE confirming that it had "reviewed the positive conflict of interest disclosure submitted for Dr. Jacqueline K. Barton, along with Caltech's proposed management plan to mitigate the conflict" and determined that Dr. Barton's position on the Dow Chemicals Board "create[d] too great a conflict to be successfully mitigated[.]"  SUF ¶ 78; dkt. 69-10.

---

[1] The parties dispute whether Dr. Barton continued as a JCAP 1 board member after September 2012.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**      'O'   JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
| --- | --- | --- | --- |
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

The letter further stated that "the lapse of time in reporting this positive disclosure [was] unacceptable to DOE." RSUF ¶ 284. Dr. Barton testified that she resigned from the JCAP 1 Board of Directors in September 2012 because DOE had informed Caltech that it would not approve her conflict management plan related to her role on the Dow Chemicals Board. SUF ¶ 79. On October 3, 2012, Caltech notified the DOE that Dr. Barton would have continued involvement with the JCAP through her role as Chair of Caltech's Division of Chemistry and Chemical Engineering. SUF ¶ 81

The JCAP Director had overall management responsibility for the JCAP 1 project and served as the primary interface between JCAP and the DOE. SUF ¶¶ 17-18. Nathan Lewis, the Relator in this action, served as the initial Director of JCAP 1. SUF ¶ 19. On January 4, 2013, Dr. Stolper, acting in his capacity as the Chair of the JCAP 1 Board of Directors, informed Relator that he was being removed as Director of JCAP 1. SUF ¶ 20. The JCAP 1 Board of Directors subsequently appointed Dr. Carl Koval, a University of Colorado professor, to serve as interim director of JCAP 1, a role he served in until December 1, 2014. SUF ¶¶ 21, 22.

Dr. Atwater replaced Dr. Koval as Director of JCAP 1, effective December 1, 2014. SUF ¶ 25. In March 2010, before JCAP 1 began, Dr. Atwater disclosed to the DOE that he was a co-founder of Alta Devices, a company formed to develop high-efficiency photvoltiac cells. SUF ¶ 84; RUSF ¶ 340. Dr. Atwater's equity interest in Alta Devices terminated before he became the Director of JCAP 1. SUF ¶ 85.

### b. Renewal of JCAP Funding

In July 2014, the DOE notified Caltech that it would consider a renewal proposal to fund JCAP for up to an additional five years. SUF ¶ 26. The DOE instructed Caltech that the additional period, which became known as JCAP 2, should have a narrowed focus on research targeting carbon-dioxide reduction and should de-emphasize research targeted solely on hydrogen production, which had been a focus of JCAP 1. SUF ¶¶ 27, 28. The DOE also informed Caltech that JCAP 2 would have "reduced funding" as compared to JCAP 1, due to the narrower focus of JCAP 2 and de-emphasis of JCAP's prior work on hydrogen production. SUF ¶ 31. DOE's renewal instructions did not direct Caltech to make any changes to the JCAP 1 budget or technical plan. RSUF ¶¶ 232 -234.

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

As part of the JCAP 2 proposal, JCAP reported to DOE that it "had completed or was on track to complete over 97% of the 256 R&D research tasks" contemplated by JCAP 1. SUF ¶ 32. Likewise, Relator stated in a September 12, 2014 email that "JCAP met > 96% of its original milestones, with no rebaselining or adjustment whatsoever." SUF ¶ 33.

### c.  JCAP 2

The DOE formally approved the renewal proposal for JCAP 2 on May 27, 2015, at which time JCAP 2's project period was September 30, 2015, to September 29, 2020. SUF ¶¶ 34-35. As noted above, the DOE and Caltech modified the existing JCAP Cooperative Agreement to cover the JCAP 2 project period. SUF ¶ 36.

JCAP 2 was governed by a Governance Board chaired by Dr. Stolper, and on which Dr. Barton also served. SUF ¶¶ 37-39. The DOE gave written permission for Dr. Barton to serve on the JCAP 2 Board via emails dated September 24, 2015, and October 29, 2015. SUF ¶ 82. When the DOE gave permission for Dr. Barton to serve on the JCAP 2 Governance Board, the DOE was aware that Dr. Barton was still serving on the Dow Chemicals Board of Directors. SUF ¶ 83.

### i.  Transition from JCAP 1 to JCAP 2

After approving the JCAP 2 proposal in May 2015, the DOE requested that Caltech provide a transition plan that would describe how Caltech planned to ramp-up its $CO_2$ reduction research for JCAP 2. SUF ¶ 40. On August 17, 2013, Caltech submitted a JCAP transition plan to the DOE. SUF ¶41. The JCAP transition plan stated that "JCAP ha[d] started to refocus its scope towards the renewal [JCAP 2] project plan that emphasizes CO2 reduction, in all of its main research projects," a transition that began "in the summer of 2014." SUF ¶ 41; Dkt 69-54 ("JCAP Transition Plan") at 3. On August 12, 2016, the DOE wrote to Dr. Atwater following an onsite review of JCAP, stating that it was "clear that JCAP had executed a smooth transition to the renewal project focus on $CO_2$ systems and has already demonstrated progress in several key areas."[2] SUF ¶ 43; dkt. 69-24 at 2.

---

[2] Relator's evidentiary objections to the August 12, 2016 letter are **OVERRULED.** Documents containing hearsay are admissible for summary judgment purposes where, as here, they "could be presented in an admissible form at trial." Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2004).

**CIVIL MINUTES – GENERAL**      **'O'   JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

The change controls were in effect during the transition from JCAP 1 to JCAP 2. RUSF ¶ 239. However, Caltech did not separately submit a Level 1 change control request or a Level 2 change control notification to DOE during the transition from JCAP 1 to JCAP 2.[3] RSUF ¶ 240.

### ii.  Carryover Funds

When JCAP 1 ended, Caltech had not yet spent approximately $5.5 million in federal funds that it had been awarded in connection with JCAP 1 (the "carryover funds"). SUF ¶ 44. Throughout JCAP 1, Caltech regularly reported the amount of carryover funds it had from the prior fiscal year to the DOE, via quarterly reports.[4] SUF ¶ 46, 65. As such, by May 2015, the DOE was anticipating that Caltech would have millions in carryover funds by the time JCAP 1 concluded in September 2015, as is "fairly common" for large research projects.[5] SUF ¶¶ 45, 47.

Caltech obtained the DOE's approval to use the JCAP 1 carryover funds after JCAP 1 ended, during JCAP 2.[6] SUF ¶¶ 49-50, 53. On May 8, 2015, Caltech contacted the DOE to propose a discussion regarding the carryover funds and Caltech's plans to use those funds after JCAP 1 ended.[7] SUF ¶ 50. On May 13, 2015, JCAP's Assistant Director, Dr. Xenia Amashukeli, and Director, Dr. Atwater, discussed the anticipated carryover funds with the DOE on a conference call with the DOE project managers, Drs. Fecko and McClean. SUF ¶ 51; see also RUSF ¶ 404. Dr. McClean, acting as the DOE's FRCP

---

[3] As noted above, Caltech contends that it had no obligation to submit a formal change control request.

[4] The quarterly reports are offered by Caltech for a non-hearsay purpose—to demonstrate DOE's knowledge of the carryover—which is relevant to materiality. As such, Relator's evidentiary objections to the quarterly reports are **OVERRULED**.

[5] Relator does not dispute the existence or content of Caltech's communications with the DOE regarding the carryover funds. However, he contends that the DOE was not notified of the source of the carryover funds, which he argues were not "accumulated naturally."

[6] The parties appear to dispute whether DOE's approval for use of the carryover funds was required under the terms of the Cooperative Agreement, including pursuant to the agreement's "change control provisions." See dkt. 79 ("Reply ISO SUF") ¶¶ 57-65.

[7] Relator's hearsay and relevance objections to this evidence are **OVERRULED**. See Fonseca, 347 F. 3d at 846.

**CIVIL MINUTES – GENERAL**       **'O'  JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|--------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

30(b)(6) witness, testified that on May 15, 2015, the DOE Program and Contracting Offices confirmed that Caltech was permitted to spend the carryover funds during JCAP 2, and that on May 18, 2015, the DOE reconfirmed that Caltech could "use the carryover funds for either JCAP 1 or JCAP 2 work." SUF ¶¶ 52-53; see also RUSF ¶ 407. In an internal email sent May 15, 2015, Dr. Amashukeli wrote to Dr. Atwater and Frances Houle: "I got a phone message from Chris confirming that we can carry-forward the JCAP 1 funds." SUF ¶ 52; dkt. 69-38.

On May 27, 2015, the DOE requested that Caltech provide a "high-level statement plan for the utilization of the carryover funds," which Caltech provided on June 22, 2015. SUF ¶ 54, 55; see also RUSF ¶ 410. The June 22, 2015 statement that Caltech submitted to the DOE's Program Office described the "JCAP Carryover Funds," estimating that "JCAP is projecting approximately 30-32% (of the annual allocation) in carryover funds in the Cooperative Agreement for Caltech," and further explained that JCAP planned to use the carryover funds both for "ramp down of the current research activities" and "continuation of $CO_2RR$ analytical work." SUF ¶ 55. Caltech stated that it anticipated using the carryover funds to support work by technical staff "to complete work associated with water splitting devices" between October 2015 and September 2016 ("10/2015-09/2016"), to support graduate and postdoctorate research during the same period, and pursue "[m]ulti-year service contracts for instrumentation." Dkt. 69-35. DOE subsequently approved Caltech's carryover plan in July 2015.[8] SUF ¶ 56.

When deposed in connection with this action, Dr. McClean testified on behalf of the DOE that "it is not uncommon, particularly for larger projects, to try to maintain some carryover as they come towards the end of the first award period." SUF ¶ 74. Dr. McClean testified that the DOE determined that Caltech's allocation and use of the carryover funds from JCAP 1 to JCAP 2 were not subject to the change controls in the Cooperative Agreement. SUF ¶ 61. Caltech's official position is likewise that the change control

---

[8] To the extent that Relator contends that Caltech's cited evidence "only references JCAP 1 work," the Court finds that he does not raise a genuine dispute of fact as to approval of the carryover plan. See dkt. 69-33 (July 1, 2015 email regarding steps to "complete processing of the award […] with regard to transition from water splitting [JCAP 1] to CO2 reduction [JCAP 2]."); McClean Depo. at 221:12-16 ("The DOE approved Caltech's plan for utilizing the carry over funds during JCAP 2.").

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

provisions in the JCAP 1 and JCAP 2 cooperative agreements did not apply to the carryover funds. RSUF ¶ 431.

### iii. Impact of the Transition on JCAP Hiring and Spending

From July 14, 2014, until May 27, 2015, Caltech did not know whether the DOE would approve the JCAP 2 proposal and, even if DOE did approve the proposal, whether JCAP 2 would have reduced funding and a narrowed focus as compared to JCAP 1. SUF ¶ 66. As such, on August 7, 2014, Dr. Amashukeli informed JCAP's project leaders that, while no staff would be laid off, as a temporary measure each new JCAP hire would need to be considered individually, within the contexts of the potentially changing scope and reduced funding for JCAP 2. SUF ¶ 67. Dr. Amashukeli's instruction was not a complete ban on hiring. Id. In May 2015, Relator hired new personnel and retroactively charged the salary of the new hire to be funded by JCAP. SUF ¶ 68.

The same month, Relator submitted a plan to JCAP management detailing how he planned to spend his project group's unspent JCAP funds during JCAP 2. SUF ¶ 73. As of July 31, 2015, two months before JCAP 1 concluded, Relator's light capture project group had spent nearly the entirety of its annual budget and was on track to spend it all. SUF ¶ 72. Relator testified in this action that he cannot recall any employee whom he was prevented from hiring between August 7, 2014, through September 29, 2015. SUF ¶ 69. Relator's Scientific Research Manager likewise testified that she could not recall any employee whom Relator was prevented from hiring between those dates and that she had no reason to believe that the JCAP administration "ha[d] acted improperly in any way" through the JCAP 1 and JCAP 2 projects. SUF ¶¶ 70, 121.

### d. Government Payment for Work Performed on JCAP Projects

The Department of Treasury's Automated Standard Application for Payments ("ASAP.gov") was Caltech's exclusive means of obtaining payment for its work on JCAP projects. SUF ¶ 94; RUSF ¶ 208. Caltech used ASAP.gov to draw federal funds for use on JCAP 1 and JCAP 2. SUF ¶ 94. When using ASAP.gov to draw funds, Caltech inputs its total costs incurred from the date of its last draw into an "amount requested" field corresponding with JCAP's project number. SUF ¶ 96; dkt. 70-4 at 69.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          'O'  JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. |

Caltech also submitted information regarding JCAP to the DOE using form SF-424. SUF ¶ 97. The SF-424 forms that Caltech submitted to DEO contain the following representation:

> By signing this application, I certify (1) to the statements contained in the list of certifications and (2) that the statements heirein are true, complete and accurate to the best of my knowledge. I also provide the required assurances and agree to comply with any resulting terms if I accept an award. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties [pursuant to 18 U.S.C. § 1001].

SUF ¶ 97. The "certifications" and "assurances" incorporated by reference into the SF-424 forms are certifications regarding lobbying, government debarment and suspension, and government requirements for drug-free workplaces found at 10 C.F.R. Part 600, *et seq.*. SUF 98.

In addition, Caltech submitted quarterly "Federal Financial Reports" to the DOE on form SF-425 throughout JCAP 1 and JCAP 2. RSUF ¶ 515. These reports provided summary financial information, such as the program's total amount of cash receipts, disbursements, and expenditures. SUF ¶ 101. The SF-425 forms that Caltech submitted prior to April 21, 2015, contained the following certification: "By signing this report, I certify that it is true, complete, and accurate to the best of my knowledge." SUF ¶ 99. Subsequent to April 21, 2015, the SF-425 forms that Caltech submitted contained a revised certification as follows: "By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and intent set forth in the award documents." SUF ¶ 100.

The JCAP 1 Board of Directors and JCAP 2 Governance Board each consulted with Caltech's Office of Sponsored Research, the Caltech office that is primarily responsible for overseeing federally sponsored projects, on technical questions regarding expenditure of federal funds on JCAP projects. SUF ¶ 112. Caltech's Associate Vice President for Research Administration testified that he was not aware of any instance in which Caltech breached the JCAP Cooperative Agreement. SUF ¶ 120.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL          'O'   JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

### e.  Relator's Claims and DOE's Subsequent Conduct

On July 9, 2018, Relator filed this *qui tam* action alleging violations of the FCA. SUF ¶ 102.  At that time, Relator disclosed to the Office of the Attorney General "substantially all material evidence and information" on which his allegations were based, pursuant to 31 U.S.C. § 3730 (b)(2).  SUF ¶ 103.  Attorneys from the Department of Justice subsequently interviewed Relator regarding his allegations.  SUF ¶ 104. On June 19, 2019, after interviewing Relator, reviewing the evidence upon which Relator's complaint was based, and conducting an investigation of Relator's allegations, the government notified the Court of its decision not to intervene in this action.  SUF 105; see also dkt. 13.  On June 20, 2019, Relator's complaint was unsealed and became publicly available.  SUF ¶ 105; see also dkt. 14.

After Relator filed his complaint and provided his disclosure statements to the government on July 9, 2018, the DOE continued to fund Caltech's work on JCAP and granted an extension allowing Caltech to continue working on JCAP 2 for an additional year after the award period ended on September 30, 2020.  SUF ¶ 106, 110.  In addition, subsequent to learning of Relator's allegations and evidence, the DOE has made no requests for reimbursement from Caltech in connection with JCAP, has made no changes to JCAP's management, and has not denied any claim that Caltech has made for payment in connection with JCAP.  SUF ¶¶ 107-108.  On November 16, 2020, Dr. McClean, acting as the DOE's FRCP 30(b)(6) witness, testified that the DOE was not aware of Caltech ever having made any false statements to the DOE in connection with JCAP, ever having performed work that fell outside the scope of either the JCAP 1 or JCAP 2 projects, or ever having breached any of its contractual obligations to the DOE under the Cooperative Agreement or other JCAP award documents.  SUF ¶ 119.

The DOE has praised Caltech's work on and management of JCAP projects, both prior to and subsequent to learning of Relator's FCA allegations.  SUF ¶¶ 111-113.  A June 29, 2017 letter from Program Office Director Bruce Garret to Dr. Atwater regarding the DOE's 2017 annual on-site review of JCAP states that "JCAP is successfully advancing fundamental science in numerous areas relevant to solar-driven production of carbon-based fuels" and generating an "excellent […] quality and quantity of results" thanks to "a highly effective leadership team and active participation of world leading investigators at all levels."  SUF ¶ 112; dkt. 69-26.  Likewise, a March 12, 2019 letter from Garrett to Dr.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'   JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

Atwater regarding DOE's 2018 on-site review of JCAP communicated findings that JCAP was "making notable advances in fundamental scientific knowledge and achieving excellent technical progress towards artificial systems for the production of renewable transportation fuels." SUF ¶ 113; dkt. 69-27. The 2019 letter further states that reviewers "appreciated the innovation and creativity of the research approaches as well as JCAP's willingness to take on highly ambitious and challenging goals," noting that JCAP's "management team was found to be highly effective and the project plan was seen as nicely coordinating research activities across the large, multi PI team while still allowing room for new ideas and scientific creativity." SUF ¶ 113; dkt. 69-27.

In July 2020, following a competitive proposal process, the DOE awarded Caltech more than $60 million to fund a new five-year research project: The Liquid Sunlight Alliance ("LiSA"). SUF ¶¶ 114, 115. LiSA is a "follow-on" project to JCAP that is designed to "build[] on the accomplishments, knowledge, and capabilities developed by JCAP," and JCAP 2 director Dr. Atwater has been selected to serve as the Director of LiSA. SUF ¶¶ 116, 118. The DOE officials responsible for overseeing Caltech's JCAP work— DOE Program Managers Drs. McClean and Fecko, and Program Office Director Garrett— were each involved in the LiSA proposal review process, and all three recommended that the DOE award LiSA to Caltech. SUF ¶ 117.

### f.  Relator's Retaliation Claim

On April 2, 2016, Relator submitted a grievance to Caltech's Provost requesting that the Provost perform an administrative review of Caltech's funding redirection decisions from JCAP 1 to JCAP 2, made pursuant to the JCAP operating agreement. Dkt. 70-4 at 79. Since Relator filed his grievance, Caltech has made no alteration to his salary, benefits or job title. SUF ¶ 152.

In September 2016, Caltech's Chair of the Division of Chemistry and Chemical Engineering, Dr. Barton, emailed Relator to notify him she was transferring oversight of the Chen-Huang annual seminar series from Relator to a different division at Caltech. SUF ¶ 154. Prior to the change, Relator had been designated to oversee the seminar series, for an initial term of three years, subject to renewal by the Chair of the Division of Chemistry and Chemical Engineering. SUF ¶ 154.

**CIVIL MINUTES – GENERAL**     **'O'  JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|--------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

## III.  LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out "specific facts showing a genuine issue for trial" in order to defeat the motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e).  The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324.  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987).  When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997).  Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue.  See Matsushita, 475 U.S. at 587.

## IV.  DISCUSSION

### A. Violation of the False Claims Act

The False Claims Act was enacted to combat "widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'  JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
| --- | --- | --- | --- |
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

government." United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1265–66 (9th Cir. 1996). The FCA imposes liability where a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To prevail under the FCA, a relator must prove: "(1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent." Hooper v. Lockheed Martin Corp., 688 F.3d 1037, 1047 (9th Cir. 2012).  The falsity requirement can be satisfied by demonstrating either express or implied false certification of a claim.  Express false certification "means that the entity seeking payment [falsely] certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted." Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010).  Implied false certification "occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation [,but does not,] and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." Id.

Relator contends that Caltech violated the FCA by submitting claims for reimbursement that falsely certified; (1) that Caltech's reported costs were "incurred in pursuit of the contractually approved JCAP 1 (and later JCAP 2) Project plan;" and (2) that at the time when Caltech's claims were submitted, Caltech was "in compliance with the material terms and conditions of the [JCAP] Cooperative Agreement." Opp'n at 2. Relator argues that Caltech's requests for reimbursement submitted on the ASAP.gov system between 2014 and 2017 were false under an implied false certification theory because Caltech "fail[ed] to disclose its noncompliance with the [JCAP] award's terms," specifically the Cooperative Agreement's change control and conflict of interest provisions. Opp'n at 23.  Relator further argues that Caltech submitted claims that were false under an express false certification theory beginning in April 2015, because the SF-425 forms that Caltech submitted to the DOE after that date affirmatively certified that Caltech sought reimbursement "for the purposes and intent set forth in the award documents." Opp'n at 25; see also SUF ¶ 100.

Caltech moves for summary judgment on each of the FCA theories Relator advances. See Mot. at 2.  The individual defendants join the entirety of Caltech's motion for summary judgment  and separately move for summary judgment on the ground that Relator cannot establish scienter as to any individual defendant. Indv. Defs. Mot. at 1.  As

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL          'O'   JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

explained below, the Court finds that Relator has failed to create a triable issue as to materiality and scienter with respect to the false claims he identifies.

### a. Materiality

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." Universal Health Services, Inc. v United States ex rel. Escobar, —U.S.—, 136 S. Ct. 1989, 1996 (2016). In Escobar, which was decided on the pleadings, the Supreme Court enunciated the standard for materiality in FCA cases. The Supreme Court first held that an express representation that a claim for payment complies with statutory, regulatory, or contractual requirements is not required to establish a defendant's liability under the FCA: "When ... a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." Id. at 1999. The Court rejected the defendant's argument that a special duty of disclosure must be shown to make an omission actionable, and instead the Court held that a representation that is a misleading half-truth could form the basis of liability under the FCA. Id. at 2000. The Court said two requirements are necessary to establish liability under the implied certification theory: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements make those representations misleading half-truths." Id. at 2001.

But the Court went on to reject the argument that any false representation that a claim satisfies statutory, regulatory, or contractual requirements is automatically material. Id. at 2001–04. The Court also rejected the defendant's argument that only those requirements expressly labeled as conditions of payment should be actionable. Id. at 2001. Instead, the Court, following common law concepts, found that materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Id. at 2002 (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003) (Williston)). The Court adopted the following alternative tests of materiality: A misrepresentation is material "[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction." Id. at 2002–03 (citation omitted). This

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**     'O'   JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|--------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

is an objective, reasonable man standard. A misrepresentation can also be material "if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not." Id. at 2003 (quoting Restatement (Second) of Torts § 538, at 80).

The Supreme Court declared that the standard of materiality is "demanding." Id. at 2003. The Court held that, as a matter of law, "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." Id. "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." Id. Nor can materiality be shown "where the noncompliance is minor or insubstantial." Id.

In light of this standard of materiality, the Court distinguished between a situation where the defendant "knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" from a situation where "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position." Id. at 2003–04. In the latter situation, the government's payment of the claim would be "strong evidence that the requirements are not material." Id. at 2004.

In saying this, the Supreme Court expressly rejected the defendant's argument that "materiality is too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss or at summary judgment." Id. at 2004 n.6. See also United States ex rel. Kelly v. Serco, Inc., 846 F.3d 325, 333 (9th Cir. 2017) ("Courts can properly dismiss an FCA claim on summary judgment on a claimant's failure to meet the rigorous standard for materiality under the FCA.").

### i.    Materiality of Alleged Breaches of Cooperative Agreement

The JCAP Cooperative Agreement between Caltech and the DOE contained change control provisions governing circumstances under which Caltech must notify or seek approval from the DOE for modifications to JCAP and a conflict of interest provision that required Caltech to make conflict of interest disclosures and propose conflict mitigation

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|-------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

plans. SUF ¶¶ 57-58; RUSF ¶¶ 200-203. Relator contends that Caltech violated the False Claims Act when it expressly and impliedly certified its compliance with those contractual provisions, which Relator argues are "expressed conditions of funding contained in the operating agreement." Opp'n at 32. Even assuming that Relator can raise triable issues of fact regarding Caltech's certification of its compliance with the Cooperative Agreement or the falsity of Caltech's certifications, however, Relator's claim fails because the undisputed evidence demonstrates that Caltech's alleged noncompliance was immaterial to the government's payment decision.

Caltech has presented uncontroverted evidence demonstrating that the DOE knew of and approved the conduct that Relator alleges as breaches of the change provisions of the Cooperative Agreement, and that the government continued to pay the claims Caltech submitted with full knowledge of Caltech's conduct. Relator fails to raise any genuine dispute of fact as to the substantial evidence demonstrating that Caltech obtained the DOE's approval to use carryover funds from the JCAP 1 project during JCAP 2. SUF ¶¶ 49-50, 53. Although the parties dispute whether such approval was required, there is no dispute that Caltech submitted regular quarterly reports regarding its anticipated carryover funds to the DOE, SUF ¶ 46, 65, that Caltech discussed those funds with the DOE in May 2015 and subsequently submitted a statement explaining its anticipated use of the carryover funds to the DOE in June 2015, SUF ¶¶ 51, 55, or that the DOE informed Caltech that it could permissibly use the carryover funds for JCAP 2 work. SUF ¶¶ 52-53; RUSF ¶ 407. Likewise, Relator cannot meaningfully dispute that in August 2015, Caltech notified the DOE that it had begun transitioning work to focus on the $CO_2$ reduction research that was the focus of the JCAP 2 project plan in 2014. The government subsequently continued to fund JCAP, even though Caltech did not separately submit a formal Level 1 or Level 2 change control request to the DOE. RUSF ¶ 240. On August 12, 2016, the DOE praised the JCAP team for "execut[ing] a smooth transition to the renewal project focus on $CO_2$ systems." SUF ¶ 43. The DOE's approval of Caltech's execution of the transition between JCAP 1 and JCAP 2, and its use of carryover funds to accomplish the transition is persuasive evidence that Caltech's failure to submit a formal change control request, even if in technical violation of the Cooperative Agreement, was not material to the government. See Escobar, 136 S.Ct. 1989 at 2003 ("[m]ateriality [...] cannot be found where noncompliance" with a contractual requirement designated as a condition of payment is "minor or insubstantial"); Kelly, 846 F.3d 325, 334-335 (affirming district court's grant of summary judgment in favor of defendant on relator's implied false certification theory

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|-------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

where the government accepted defendant's reports and continued to pay claims despite defendant's non-compliance with certain reporting requirements).[9]

_____

[9] At the hearing, Relator argued that Caltech's communication with the DOE regarding the scope of its JCAP funding and its use of the carryover funds did not provide the DOE with actual knowledge of improper use of the carryover funds during the JCAP 2 period, including use of the carryforward funds to pay the salary of an IT technician and maintain instruments used for non-JCAP work in 2016, see RUSF ¶¶ 442-43, see also ¶¶ 422-30, 441, 444-47, and therefore that Caltech's conduct during JCAP 2 gives rise to a triable issue of fact as to materiality.  The Court disagrees, for two reasons.  **First**, Relator's response to the statement of undisputed facts fails to satisfy his burden to present non-conclusory evidence demonstrating that Caltech misallocated carryover funds during JCAP 2.  For example, Relator's conclusory statements in his own declaration that Caltech funded an IT staff member who provided support to JCAP personnel without DOE approval and otherwise "spent the Carryforward funds in a manner that [is] inconsistent with the Carryforward Statement," without supporting evidence, are insufficient to raise a triable issue of fact. See e.g. Green Crush, LLC v. Paradise Splash I, Inc., et al. No. SACV 17-01856-CJC (JDEx), 2019 WL 8640654, at *9 (C.D. Cal. Nov. 25, 2019) (finding conclusory declaration from plaintiff's CEO insufficient to raise triable issues of fact).  And the deposition testimony Relator cites to support his assertion that Caltech misused carryover funds "to maintain instrumentation used for non-JCAP work" itself explains that Caltech "specifically requested from DOE permission" to use carryover funds to maintain these "instruments […] used for JCAP purposes" and other work.  Dkt. 70-2, Exh. F at 203:18-205:5. **Second**, Relator's argument improperly discounts the government's *present* knowledge of his allegations of fraud, including his allegations regarding this conduct during JCAP 2.  As discussed in detail *infra*, although not dispositive in the face of strong countervailing evidence, the fact that Relator has disclosed all of his allegations of fraud to the government and the government has not intervened in this action or otherwise sought repayment from Caltech is strong evidence that the government has determined that the alleged conduct is immaterial.  Put another way, there is no dispute that the government is aware of all of the fraudulent conduct that Relator alleges *now* and has taken no action demonstrating that the government finds the alleged conduct material. See e.g. United States ex rel. McBride v. Halliburton Co., 848 F.3d 1027, 1034 (D.C. Cir. 2017).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**     **'O'  JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

Likewise, there is undisputed evidence showing that that the DOE knew of the conflicts of interest issues that Relator's claims address, understood that Drs. Barton and Atwater would continue their involvement in JCAP, and made no resulting changes to its funding decisions. Relator argues that Caltech knew that compliance provisions were material to the government because the "DOE ordered [Dr.] Barton off the JCAP 1 Board" and Dr. Barton subsequently attended two JCAP I board meetings. Opp'n at 33; RUSF ¶ 296. However, none of the evidence that Relator points to supports his position the government would have found Dr. Barton's continued involvement with JCAP to be material. To the contrary, the documents Relator relies on confirm that Dr. Barton resigned from the JCAP 1 Board in 2012 in response to the government's determination that her position on the Dow Chemicals conflict created a conflict, and that Caltech subsequently informed the DOE that Dr. Barton would continue with "significant responsibilities for oversight" on JCAP 1 in her role as Chair of the Division of Chemistry and Chemical Engineering. RSUF ¶¶ 301-302; dkt. 69-11 (Barton Depo. Exh. 93). And it is undisputed that the DOE subsequently twice approved Dr. Barton to serve on the JCAP 2 Governance Board, while on notice that Dr. Barton was still a member of the Dow Chemicals Board of Directors. SUF ¶¶ 82-83. That series of events, and the absence of any further objection from the DOE to Dr. Barton's ongoing involvement with JCAP, provides strong evidence of immateriality. See Escobar, 136 S.Ct. 1989 at 2003. Likewise, to the extent that Relator contends that Dr. Atwater's involvement with Alta Devices would have been material to the government's payment decisions, the undisputed evidence shows that Dr. Atwater disclosed his co-founder status to the DOE in March 2010, before JCAP 1 began, and that the DOE has subsequently repeatedly approved Dr. Atwater's leadership roles on the JCAP and LiSA projects. SUF ¶¶ 84, 85 112-113; 118.

Moreover, the government's continued funding of JCAP after learning of the alleged fraud when Relator filed this action belies Relator's arguments that the government would have refused to pay if the DOE knew of violations of the Cooperative Agreement's change control and conflict of interest provisions and provides "very strong evidence that those requirements were not material." United States ex rel. Harman v. Trinity Indus. Inc., 872 F.3d 645, 661 (5th Cir. 2017) (quoting Escobar, 136 S.Ct. 1989 at 2003-04). Although "not dispositive, continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on relator to demonstrate materiality." Id. at 663; see also United States ex rel. McBride v. Halliburton Co., 848 F.3d 1027, 1034 (D.C. Cir. 2017) (affirming summary judgment in favor of defendant where the government

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

continued to pay claims and "did not disallow any charged costs" after learning of and investigating the relator's allegations, because "what actually occurred" (i.e. the government's continued payment) provided "very strong evidence that the requirements allegedly violated [were] not material"); United States ex rel. Berg v. Honeywell Int'l, Inc., 740 F. App'x 535, 538 (9th Cir. 2018) (relator failed to raise triable issue as to materiality where evidence demonstrated that the Army continued paying claims "up to at least 2008, despite being aware of Relators' fraud allegations since at least 2002").

As in those cases, "the [G]overnment's actual behavior in *this* case suggests that [Relator's] allegations are immaterial." United States ex rel. Janssen v. Lawrence Mem'l Hosp., 949 F.3d 533, 542 (10th Cir.) (emphasis in original), cert. denied, 141 S. Ct. 376, 208 L. Ed. 2d 98 (2020). When Relator filed this lawsuit in July 2018, and disclosed "substantially all material evidence and information" related to his allegations to the government, the Department of Justice conducted an investigation of Relator's claims, interviewed Relator regarding the substance of his allegations, and ultimately determined that the United States would not intervene in this action. SUF ¶ 105. Since investigating Relator's fraud allegations in 2018, the government has "done nothing in response and continues to pay [Caltech's JCAP] claims." See Janssen, 949 F.3d 553 at 542 (finding that even in the absence of "actual knowledge" of alleged infractions, "inaction in the face of detailed [FCA] allegations from a former employee suggests immateriality."). Specifically, the undisputed evidence shows that since Relator filed his complaint, the DOE has not denied any claim that Caltech has made for payment in connection with JCAP, has not requested that Caltech repay any funding it previously received from the government in connection with JCAP, and has made no changes to JCAP's management. SUF ¶¶ 107-108. The fact that the DOE has neither denied reimbursement for any of Caltech's post-2018 claims related to JCAP work, nor sought to recover any of the funds that Caltech received in connection with its allegedly false claims "casts serious doubt on the materiality of the fraudulent representations that [Relator] alleges."[10] D'Agostino v. ev3, Inc., 845

---

[10] At the hearing, Relator argued for the first time that the DOE's continued payment of all of Caltech's JCAP claims, despite the government's knowledge and investigation of Relator's fraud allegations,  is distinguishable from those instances discussed by Escobar where "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position." See Escobar, 136 S. Ct. 1989 at 2003. Relator argued that  the "particular type

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'   JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

F.3d 1, 7 (1st Cir. 2016) (quoting <u>Escobar</u>, 136 S.Ct. 1989 ("[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, *and has signaled no change in position*, that is strong evidence that the requirements are not material.") (emphasis added). Likewise, the DOE's testimony in this action that it had found "nothing inappropriate" about Caltech's performance of JCAP 2 work before the JCAP 2 project officially began weighs against a finding that Caltech's alleged misrepresentations related to that work were material.  SUF ¶ 42.

In fact, in addition to its continued funding of JCAP, the DOE has expanded its work with Caltech on JCAP 2 and related projects.  SUF ¶¶ 102-22.  The DOE granted Caltech a one-year extension to continue its work on JCAP-2.  SUF ¶ 110.  In addition, in July 2020, the DOE awarded Caltech the new $60 million, 5-year LiSA project as a "follow-on" to Caltech's work on JCAP, with the endorsement of the DOE officials responsible for overseeing JCAP.  SUF ¶¶ 114-118. The DOE selected Dr. Atwater to direct the LiSA project, despite its knowledge of Relator's conflicts allegations. SUF ¶ 118.  It strains

---

of claim" referenced by <u>Escobar</u> is limited to instances where the government has continued to pay identical claims, such as claims for reimbursement of particular diagnosis or procedure codes in Medicare billing, and, as such, that because Caltech's weekly reimbursement requests do not always cover an identical scope of JCAP work, the government's continued payment does support a finding of immateriality.  The Court disagrees. Relator overreads <u>Escobar</u>, which does not instruct that a "particular type of claim" is so narrow as to apply only to identical claims, but instead contrasts the government's continued payment of claims of a certain type against instances in which "the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." <u>Id.</u> at 2003-2004.  As the Ninth Circuit explained in <u>Kelly</u>, the government's acceptance of periodic cost reports despite their non-compliance with regulatory requirements and payment for contracted work reported via those reports is the type of regular government conduct that weighs against a finding of materiality.  See 846 F.3d 325 at 334 ("Given the demanding standard required for materiality under the FCA, the government's acceptance of Serco's reports despite their non-compliance with ANSI– 748, and the government's payment of Serco's public vouchers for its work under Delivery Orders 49 and 54, we conclude that no reasonable jury could return a verdict for Kelly on his implied false certification claim.")

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|--------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

credulity to imagine that the DOE would continue entering into multi-million-dollar funding arrangements with Caltech to continue JCAP's work and continue allowing Dr. Atwater to lead that work, without comment, if the claimed false certifications were material. See United States ex rel. Bachert v. Triple Canopy, Inc., 321 F. Supp. 3d 613, 621 (E.D. Va. 2018) (granting summary judgment as to materiality because undisputed facts demonstrated that "the State Department never asked for any money back from defendant upon learning of [relator's] allegations" and repeatedly renewed defendant's contracts was "undisputed and insurmountable."); see also Cimino v. Int'l Bus. Machines Corp., No. 13-CV-00907 (APM), 2019 WL 4750259, at *7 (D.D.C. Sept. 30, 2019) (dismissing FCA claim on materiality grounds because it was "implausible" that the IRS would continue to pay on allegedly false claims and "add six month to the agreement for an additional cost of $16,147,772" if the claimed falsity was material).

Relator argues that the government's continued funding of JCAP after this lawsuit was filed is "wholly irrelevant" to the Court's analysis of materiality because "there is no evidence of actual knowledge." Opp'n at 33. In so arguing, Relator points the Court to a group of deposition statements from Dr. McClean, the DOE's 30(b)(6) witness, that he contends demonstrate that the DOE did not know that Caltech made "unilateral changes" during the JCAP 1 project period without complying with the change controls, and would have acted had it been aware of such a breach. RUSF ¶¶ 275-77. That argument misses the mark for several reasons. First, the deposition testimony Relator references is entirely speculative and, while stating generally that the DOE expects Caltech to comply with the terms of the Cooperative Agreement, does not raise a triable issue of fact as to the government's knowledge or assessment of the particular conduct at issue here.[11] Second, as discussed *supra*, there is substantial, uncontroverted evidence demonstrating that the DOE was aware of each of the actions that Relator now claims are improper, including

---

[11] Relator cites to a single instance in which the DOE learned that Caltech charged disallowed conference costs to JCAP 1 and that funding was repaid as evidence that the conduct at issue would have been material to the DOE. RSUF ¶ 256; dkt. 69-1 at 252-253. The Court notes, however, that conference and travel expenses are not at issue in this action and that the government's decision to seek reimbursement of those expenses bolsters the conclusion that the conduct at issue here is immaterial, because the government has not sought reimbursement related to the conduct at bar.

**CIVIL MINUTES – GENERAL**     'O'   JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|--------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

Caltech's transition to JCAP 2 work in advance of JCAP 2's start date and Caltech's accumulation and use of the carryover funds. SUF ¶¶ 49-53.

Further, the government's present knowledge of the conduct at issue here is, contrary to Relator's assertions, relevant to the materiality analysis. As the Court of Appeals for the Tenth Circuit explained in Janssen, even where a federal agency "may not have independently verified [defendant's] noncompliance—and thus may not have obtained "actual knowledge" of the alleged infractions—its inaction in the face of detailed allegations from a former employee suggests immateriality." 949 F.3d 533 at 524. Likewise, while knowledge of allegations, alone, is generally insufficient to warrant dismissal under Rule 12(b)(6), the same may constitute "evidence of immateriality under Rule 56(a), especially where the government "has continued to pay claims—and has requested no changes […] for years despite ongoing litigation."[12] Id. at 542, n. 13

---

[12] Additionally, Relator contends that the "government can pay claims with actual knowledge of misconduct and nonetheless demonstrate that it considered this behavior to be material" and "there may be other reasons why the government continues to pay these claims." Opp'n at 35. That speculative argument does not raise a triable issue as to materiality because it is unsupported by any evidence in the record that tends to explain how the government has "demonstrate[ed] that it considered this behavior to be material" or otherwise explaining why the government would continue to pay the claims at issue if it found them material. See United States ex rel. Hartpence v. Kinetic Concepts, Inc., No. 2:08-cv-01885-CAS (AGRx), 2019 WL 3291582, at *13 n. 10 (C.D. Cal. June 14, 2019). After reviewing the Court's tentative order, Relator speculated at the hearing that the government might continue reimbursing Caltech despite knowledge of false claims because it would be burdensome to entirely cancel the JCAP project, after years of research, in response to Relator's allegations. The Court is not persuaded by that argument. Contrary to Relator's assertion, nothing would prevent the government from continuing to fund the JCAP research while also refusing to pay certain disputed claims or seeking reimbursement of certain improperly allocated funds, as it did when certain conference costs charged to JCAP 1 were disallowed. See RSUF ¶ 256. Here, Relator is unable to point to a single refusal to pay, request for reimbursement, or corrective action imposed by the DOE as to any of the false claims he alleges. By contrast, courts have found materiality in instances where the government did not terminate program or contract-level funding, but evidence showed that the government imposed corrective actions and sought

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

(distinguishing the First Circuit's order on remand in U.S. ex rel. Escobar v. Univ. Health Servs., Inc., 842 F.3d 103, 112 (1st Cir. 2016) based on procedural posture and because the Escobar allegations "only noted that the Government continued to pay claims up to the filing of litigation.").

In addition, the evidence that Relator cites to contend that Caltech engaged in a "cover-up" regarding its conduct during the transition from JCAP 1 to JCAP 2 does not raise a triable issue of fact as to materiality. The facts Relator points to demonstrate that a "cover up" occurred each relate to Caltech's decision not to provide Relator with certain data related to the grievance that Relator filed with the University, and *not* to any alleged representations or omissions that Caltech made in its communications with the DOE.[13] See RSUF ¶¶ 244-245. Those facts are unlike the situation confronted by the Court of Appeals for Fourth Circuit in Triple Canopy, upon which relator relies. The court in Triple Canopy determined that allegations that the defendant defense contractor repeatedly falsified contractor marksmanship scorecards, which it anticipated that the government would review and were thus "integral to the false statement," were sufficient to support materiality at the pleadings stage, in part because "the government did not renew its contract with Triple Canopy and immediately intervened in this litigation." United States v. Triple Canopy, Inc., 857 F.3d 174, 179 (4th Cir. 2017) (incorporating statement of facts as recited by United States v. Triple Canopy, Inc., 775 F.3d 628, 632 (4th Cir. 2015), cert. granted, judgment vacated sub nom. Triple Canopy, Inc. v. U.S. ex rel. Badr, 136 S. Ct. 2504, 195 L. Ed. 2d 836 (2016)).

Accordingly, in light of the demanding standard required for materiality under the FCA, and Relator's failure to adduce any evidence that would meet this standard under

---

reimbursement targeting the false claims at issue. See United States Ex Rel. Rose v. Stephens Institute, 909 F.3d 1012, 1022 (9th Cir., 2018) ("the Department can demonstrate that requirements […] are material without directly limiting, suspending, or terminating" the program.)

[13] Likewise, to the extent that they constitute facts and not legal argument, Relator's assertions that Caltech's position regarding its actions during the final year of JCAP 1 has been inconsistent do not have strong support in his underlying evidence. See generally RSUF ¶¶ 246-260.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL     'O'   JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

<u>Escobar</u>, the Court finds that Relator has failed to set out specific facts showing a genuine issue for trial regarding the materiality of purported misrepresentations related to the change control provisions.[14]

### b. Scienter

To prevail under the FCA, a relator must prove that a defendant had "actual knowledge" of a false claim or acted with "deliberate ignorance" or "reckless disregard." 31 U.S.C. § 3729(b)(1). The FCA's scienter requirement, like its materiality requirement, is "rigorous." <u>Escobar</u>, 136 S. Ct. at 2002. Liability turns on "whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." <u>Id.</u> at 1996. The Court finds that Relator has failed to establish a genuine issue of material fact with respect to Caltech's scienter when it submitted the claims at issue here.

Relator contends, without citation to specific evidence, that Caltech and each of the individual defendants acted with the requisite scienter because they "admit they were aware of their obligations under the Cooperative Agreement," and they "admit those obligations were important and that they knew that the government thinks the same," and nevertheless engaged in a "coverup." Opp'n at 37. The Court finds that defendants' knowledge of the terms of the Cooperative Agreement and its "importance" to DOE, without more, is insufficient to create a triable issue of fact as to scienter. That is because, as discussed *supra* with respect to materiality, Relator has adduced no evidence demonstrating that defendants "knowingly violated a requirement" that they knew was material to the government's payment decision. <u>Escobar</u>, 136 S. Ct. at 2002; <u>see also</u> <u>United States ex rel. Hartpence v. Kinetic Concepts, Inc.</u>, No. 208CV01885CASAGR, 2019 WL 3291582, at *16 (C.D. Cal. June 14, 2019) (explaining that scienter turns not on whether defendant knew it was submitting claims in violation of regulatory requirements, but rather on whether it "knew that submitting [nonconforming claims] was material to the government's payment decision"). To the contrary, the undisputed evidence demonstrates that Caltech made

---

[14] Because Relator cannot show a genuine dispute of material fact as to materiality, his FCA fraud in the inducement theory also fails. See <u>Cimino</u>, 2019 WL 4750259, at *5 ("[A] plaintiff alleging fraud in the inducement must plead not only that the omitted information was material but also that the government was induced by, or relied on, the fraudulent statement or omission.")

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

repeated disclosures to the DOE regarding the conduct at issue and the DOE approved of those actions and continued its payments. See e.g. United States ex rel. Vatan v. QTC Med. Servs., Inc., No. CV 14-8961 PA (SSX), 2019 WL 1452907, at *13 (C.D. Cal. Feb. 12, 2019), aff'd sub nom. Vatan v. QTC Med. Servs., Inc., 812 F. App'x 485 (9th Cir. 2020) (no FCA scienter where "undisputed evidence shows that the [government agency] was aware of and approved of the various aspects of [defendant's] performance").

As support for his scienter argument, Relator also makes general reference to Caltech's "insistence on implausible interpretations of the change controls." Id. Defendants' disagreement with Relator's subjective interpretation of the Cooperative Agreement does not raise a triable issue of material fact as to defendants' "actual knowledge" of a false claim.  See United States v. McKesson Corp., No. 19-CV-02233-DMR, 2020 WL 4805034, at *5 (N.D. Cal. Aug. 18, 2020) (explaining, with respect to falsity, that "[a]n FCA relator cannot base a fraud claim on nothing more than his own interpretation of an imprecise contractual provision.") (quoting U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 378 (4th Cir. 2008)); U.S. ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 329 (9th Cir. 1995) ("The improper interpretation . . . of a contract, without more, does not constitute a false claim.").  As such, the Court finds that Relator has failed to make a showing sufficient to establish a triable issue as to defendants' scienter.

Accordingly, Caltech's motion for summary judgment as to Relator's FCA claim is **GRANTED**.[15]

### B. Retaliation in Violation of the FCA

Relator's second claim for relief alleges that in 2016, Caltech retaliated against him after he filed a written grievance with Caltech's provost requesting an audit of JCAP's operations by "removing him from oversight" of the Chen-Huang Seminar Series.  FAC ¶¶

---

[15] In his opposition, Relator requests that the Court allow a limited re-opening of discovery pursuant to Federal Rule of Civil Procedure 56(d), should the Court be inclined to grant Caltech's motion to dismiss his FCA claim "for lack of evidence of falsity." Here, because the Court grants the motion for summary judgment as to Relator's FCA claim on materiality and scienter grounds, it need not reach Relator's Rule 56(d) request.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL          'O'  JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|--------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

68, 81-85.  Section 3730(h) of the FCA is intended to "protect 'whistleblowers,' those who come forward with evidence their employer is defrauding the government, from retaliation by their employer." U.S. ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996). Specifically, the statute imposes liability on an employer that "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under" the FCA's other provisions. 31 U.S.C.A § 3730(h) (West). To prove an FCA retaliation claim, an employee must demonstrate three elements: "(1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected activity; and (3) that the employer discriminated against the plaintiff because he or she engaged in protected activity." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1103 (9th Cir. 2008).

The Ninth Circuit has not expressly applied the Supreme Court's McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting framework to FCA claims. However, this Court has previously followed a number of district courts in this district and others that have noted that the Ninth Circuit has imported Title VII doctrine to the FCA in other contexts and applied McDonnel-Douglas to FCA retaliation claims. See Lillie v. ManTech Int'l. Corp., No. 2:17-CV-02538-CAS-SS, 2018 WL 6133706, at *7 (C.D. Cal. Sept. 24, 2018) (collecting cases). Accordingly, the Court will apply the McDonnell-Douglas burden shifting analysis.

Here, Caltech does not contest that Relator engaged in protected activity or that defendant knew of Relator's protected activities. Instead, Caltech seeks summary judgment on Relator's retaliation claim on the grounds that: (1) Caltech did not subject Relator to an "adverse" employment action because it "did not alter Relator's salary, benefits, of job title;" and (2) Caltech has offered a legitimate, non-retaliatory reason for the decision not to renew Relator's oversight of the seminar series, which relator cannot demonstrate is pretexual.  Mot. at 24 -25.

### a. Plaintiff's Prima Facie Case

To establish a prima facie case under the FCA, plaintiff must make "an initial showing" that (1) plaintiff engaged in protected activity, (2) plaintiff's employer knew that he engaged in protected activity, and (3) the employer discriminated against plaintiff because of his protected activity. Sears v. Hous. Auth. of the Cty. of Monterey, No. 11-

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|-------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

CV-1876-LHK, 2014 WL 1369594, at *7 (N.D. Cal. Apr. 7, 2014) (citing Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1060 (9th Cir. 2011)). Importantly, "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." Lyons v. England, 307 F.3d 1092, 1112 (9th Cir. 2002) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) ).  "At the summary judgment stage, the requisite degree of proof necessary to establish a prima facie case ... is minimal and does not even need to rise to the level of a preponderance of the evidence." Id. (citations omitted).

As noted above, Caltech concedes that Relator engaged in protected activity and that Caltech was aware of that protected activity. As such, Relator need only make a prima facie showing that he suffered an adverse employment action.

### i. Adverse Employment Action

For the purposes of the third element of an FCA retaliation claim, "behavior does not constitute retaliation ... unless it would be sufficient to constitute an adverse employment action under Title VII." Moore v. California Inst. of Tech. Jet Propulsion Lab'y, 275 F.3d 838, 847-48 (9th Cir. 2002).  Under this formulation, "an action may be cognizable as discrimination ... if it is reasonably likely to deter employees from engaging in activity protected under" the FCA.  Id. at 848.  The Ninth Circuit "define[s] 'adverse employment action' broadly."  Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 847 (9th Cir. 2004).  "Transfers of job duties and undeserved performance ratings, if proven, would constitute "adverse employment decisions [.]'"  Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).  So too, can "a transfer to another job of the same pay and status[.]"  Ray v. Henderson, 217 F.3d 1234, 1241 (9th Cir. 2000) (citing St. John v. Employment Development Dept., 642 F.2d 273, 274 (9th Cir. 1981)); see also Passer v. American Chemical Soc., 935 F.2d 322, 330–331 (D.C. Cir.1991) (employer's cancellation of public event honoring employee constitutes "adverse employment action" within the meaning of the Age Discrimination in Employment Act, which has anti-retaliatory provision parallel to those of FCA and Title VII).

The Court finds that a reasonable fact finder could conclude that Relator suffered an adverse employment action when he was notified that he would not continue in his role in overseeing the Chen-Huang Seminar Series.  Specifically, Relator has averred in his declaration that his work overseeing the Chen-Huang Seminar Series "[s]erved as a platform for [Relator] to meet with prominent thought leaders in the field of sustainable

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL          'O'  JS-6

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

energy." Dkt 74 ("Lewis Decl.") ¶ 60. As such, Relator explains that he has "since been restricted from being able to widen [his] reputation" within the field as a result of his removal from that role. Id. Although, as Caltech notes, Relator testified at his deposition that he was unable to point to any specific instance in which he was treated differently by a professional contact after his oversight role ended, Relator also testified that he had lost opportunities to expand his professional network and acquire new outside consulting work. Dkt. 69-12 ("Lewis Depo.) at 275:3-276:12. As such, the Court concludes that Relator's evidence of professional harm, while not substantial, is sufficient to make out a prima facie case.[16] See Bastidas v. Good Samaritan Hosp. LP, No. 13-CV-04388-SI, 2016 WL 1029465, at *6 (N.D. Cal. Mar. 15, 2016) (hospital's retaliatory failure to update physician's online professional profile caused damage to plaintiff's professional reputation sufficient to allege an adverse employment action).

### b. Non-Retaliatory Reasons

Given Relator's establishment of a prima facie case of retaliation under the FCA, defendant must now show legitimate, non-retaliatory reasons for it adverse employment decision. "This burden is one of production, not persuasion" and it is met where defendant offers "admissible evidence sufficient for the trier of fact to conclude that petitioner [suffered an adverse employment action] because of" defendant's stated legitimate reasons. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142 (2000) (internal citations omitted).

---

[16] Caltech's argument that Relator cannot have suffered an "adverse action" merely because it is undisputed that Caltech did not alter Relator's salary, benefits, or job title in response to his grievance is misplaced. See Reply at 22-23; SUF ¶ 152. Caltech's cited authority does not stand for the proposition that harm to a plaintiff's professional reputation or outside job prospects is not an "adverse action" within the meaning of Title VII under Ninth Circuit law. See Patterson v. Apple Comp., Inc., 2005 WL 2277005, at *21 (N.D. Cal. Sept. 19, 2005) (finding that a workload reduction did not constitute an "adverse action" absent a change to salary, benefits, or title); Chiang v. Gonzales, 2005 WL 8168158, at *11 (C.D. Cal. Dec. 7, 2005) (recognizing that absent a material change in terms and conditions of employment, an employment action that "is humiliating or embarrassing, or that leads to ostracism or ridicule by fellow employees" is not sufficient, but distinguishing "[a]n employment action that leads to loss of future employment opportunities.").

**CIVIL MINUTES – GENERAL**        **'O'   JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

The Court finds that Caltech has met its burden of production by presenting evidence showing that Dr. Barton determined that Relator would not continue overseeing the Chen-Huang Seminar series both: (a) because Relator's initial three-year term of overseeing the seminar series had expired, and (b) because Relator had failed to regularly hold the seminar series during his term, which had raised concerns from the sponsoring donor.  Mot. at 24. Caltech presents evidence demonstrating that Relator was designated to oversee the Chen-Huang Seminar series for "an initial term of three years, which would be subject to renewal by the Chair of the Division of Chemistry and Chemical Engineering," Dr. Barton. SUF ¶¶ 153-154.  Caltech's evidence further shows that, as of September 8, 2016, Relator's three-year term had expired, and Dr. Barton notified defendant that she did not intend to renew his term pursuant to the endowment agreement, but would instead transfer oversight of the series to a different Caltech division.  Id.  In addition, the September 8, 2016 email that Caltech has produced between Relator, Dr. Barton, and Dr. Stolper in which Dr. Barton explains that Relator "was in charge of this seminar series, with funds from Marina Chen, but in the last few years it wasn't happening with regularity […] Marina would much prefer if we take it over and have Jonas in charge, since 'nothing has been happening,' 'he doesn't give us notice when the lecture is,' and 'he doesn't respond to my emails." Dkt. 69-58.  A number of courts considering decisions not to renew expired employment contracts or internal titles have determined that an employee's prior failure to perform certain job functions or lack of desired skills moving forward was a legitimate, non-discriminatory reason.  See e.g. Bonzani v. Shinseki, No. 2:11-CV-0007-EFB, 2013 WL 5486808, at *8 (E.D. Cal. Sept. 30, 2013) (evidence showing failure to perform duties including "timely mak[ing] on call schedules" and manage anesthesiologist leave schedule provided legitimate, non-discriminatory reasons for decision not to renew plaintiff's employment as Chief of Anesthesia.); Serlin v. Alexander Dawson School, 2014 WL 1573535, at *7 (D.Nev., 2014) (finding legitimate, non-discriminatory reason's for non-renewal of teacher's contract where the school "anticipated instituting a requirement […] that all fifth grade teachers be able to teach math" and plaintiff had no experience teaching math, and plaintiff had demonstrated that she was "unable to get along with the other fifth grade team members.").  Further, Dr. Barton testified that she believed she "was doing [Relator] a favor" by removing his oversight role because "[r]unning a seminar series is not a plum position … it's not something that most of the faculty in the division are interested in doing unless they have to." SUF ¶ 157.  This evidence satisfies defendant's burden of production.

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

### c.  Plaintiff's Showing of Pretext

The third step of McDonnell-Douglas shifts the burden of proof back to the plaintiff, who must then establish that defendant's stated reasons for the adverse employment action were pretextual.  411 U.S. at 804.  Specifically, if defendant establishes a legitimate, non-retaliatory reason for its adverse employment action, the initial "presumption of discrimination 'drops out of the picture' " and the employee plaintiff must prove that defendant's proffered legitimate reason is pretextual.  Reeves, 530 U.S. at 143 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).  "The difference between the first and third steps of the McDonnell-Douglas framework is not without some consequence. Among other things, a plaintiff's burden is much less at the prima facie stage than at the pretext stage."  Hawn v. Executive Jet Mgmt., Inc., 615 F.3d 1151, 1158 (9th Cir. 2010). "To avoid summary judgment at this step, however, the plaintiff must only demonstrate that there is a genuine dispute of material fact regarding pretext."  Rutherford, No. CV13-01247 JAK (OPx), 2015 WL 12864244, at *23 (C.D. Cal. Mar. 13, 2015) (quoting Nicholson, 580 F.3d at 1126).  Additionally, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.'" Reeves, 530 U.S. at 143 (citing Burdine, 450 U.S. at 256).

The Court finds that Relator has not produced evidence "sufficient ... to create a genuine issue as to whether retaliation was the real motive underlying" Dr. Barton's decision not to renew his oversight of the seminar series.  Sears, No. 11-CV-1876-LHK, 2014 WL 1369594, at *10 (N.D. Cal. Apr. 7, 2014) (citing Harrington, 668 F.3d at 31). Relator does not present any argument in his opposition that Dr. Barton's stated reasons for not renewing his oversight of the seminar series were pretextual, and the only evidence that Relator presents that could plausibly demonstrate that Dr. Barton's reasons were pretexual is an unsupported assertion in his declaration that "Defendants Caltech and Dr. Barton did not convene such a seminar for the entire 2016 year.[17]  See Opp'n at 40; Lewis

---

[17] At the hearing, Relator pointed to an April 2017 statement from his former assistant, Barbara Miralles, as evidence that Dr. Barton's stated reasons for Relator's removal from the Chen-Huang Seminar Series were pretextual.  See Lewis Decl. ¶ 61, Exh. II.  The Miralles statement recounts an April 2017 conversation during which Relator's former student asked Miralles "what it would take for Prof. Lewis to settle his dispute with

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|----------|-------------------------|------|----------------|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

Decl. ¶ 60. While a failure to begin holding seminars following the change in leadership raises some question regarding Dr. Barton's stated reasons, this single statement in Relator's declaration is not, on its own, sufficient to raise a triable dispute of fact, especially given that the period between the change and the end of 2016 lasted only four months. Moreover, Relator has testified that he does not know why he was removed from overseeing the seminar series, and makes no attempt to explain or contradict that testimony here. SUF ¶¶ 159. Based on this record, the Court finds that Relator has not met his burden of demonstrating pretext.[18]

Accordingly, the Court **GRANTS** Caltech's motion for summary judgment as to Relator's FCA retaliation claim.

---

Caltech, his grievance" and suggested that Relator "was leaving Caltech."   However, the Miralles statement makes no reference to the decision not to renew Relator's oversight of the Chen-Huang Seminar Series, approximately nine months earlier, or to Dr. Barton. As such, it does not provide evidence demonstrating that Dr. Barton's stated reasoning was pretextual.

[18] At the hearing, Relator argued for the first time that the temporal proximity between his April 2, 2016 grievance and September 8, 2016 removal from oversight of the Chen-Huang Seminar Series, a period of five months, demonstrates pretext. However, "while evidence of temporal proximity is sufficient to demonstrate a prima facie case of retaliation […] it is generally insufficient to satisfy the secondary burden to provide evidence of pretext." Hooker v. Parker Hannifin Corp., 548 F. App'x 368, 370 (9th Cir. 2013) (employee's "terminat[ion] a week after taking two days of approved medical leave" did not create a triable issue as to pretext); see also Brooks v. Capistrano Unified Sch. Dist., 1 F. Supp. 3d 1029, 1038 (C.D. Cal. 2014) ("mere temporal proximity is generally insufficient to show pretext"); Miglani v. Edwards Lifesciences, LLC, No. 8:17-CV-00418-JLS (DFMx), 2018 WL 6265007, at *5 (C.D. Cal. Jan. 8, 2018) ("the temporal remoteness between Plaintiff's alleged protected activity in April 2016 and his termination in December 2016 does not give rise any inference of pretext.")  Accordingly, the Court finds that the five-month period between relator's grievance and his removal from the seminar series does not, on its own, give rise to a triable issue as to pretext.

**CIVIL MINUTES – GENERAL**          **'O'   JS-6**

| Case No. | 2:18-cv-05964-CAS(RAOx) | Date | April 19, 2021 |
|---|---|---|---|
| Title | UNITED STATES OF AMERICA EX REL. NATHAN S. LEWIS V. CALIFORNIA INSTITUTE OF TECHNOLOGY, ET AL. | | |

## V.    CONCLUSION

In accordance with the foregoing, the Court orders as follows:

1. The Court **GRANTS** summary judgment to Caltech and the individual defendants as to Relator's FCA claim.

2. The Court **GRANTS** summary judgment to Caltech and the individual defendants as to Relator's FCA retaliation claim.

IT IS SO ORDERED.

|  | 01 | : | 12 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |